**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 30 2001**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

CLARENCE R. BRAMLETT,

    Petitioner-Appellant,

v.

RON CHAMPION,

    Respondent-Appellee.

No. 00-6213
(D.C. No. CIV-97-1579-R)
(W.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE**, **HOLLOWAY**, and **McWILLIAMS**, Circuit Judges.

---

Petitioner Clarence R. Bramlett, an Oklahoma state prisoner convicted of first degree murder and sentenced to life without parole, appeals the district court's denial of his 28 U.S.C. § 2254 habeas petition. We exercise jurisdiction pursuant to 28 U.S.C. § 1291. We affirm the district court's judgment on Bramlett's ineffective assistance of counsel claim and reverse and remand with directions to the district court to conduct an evidentiary hearing, and such other proceedings as may be necessary, on Bramlett's claim under Brady v. Maryland, 373 U.S. 83 (1963).

---

[*]    This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

I.

This case arises out of the death of Derrick Rhodes, a nineteen-year-old Oklahoma City resident. Rhodes attended a rap concert in Oklahoma City on the evening of July 15, 1989. Rhodes left the concert with a friend, Broderick Cofer, and they eventually ended up at a large, outdoor "street party." Rhodes and Cofer observed an acquaintance, Alex Downing, get into a fight with several members of the Tulsa Crips gang. Rhodes approached the gang members and suggested that they fight Downing "one-on-one." Tr. at 441. The gang members responded by physically attacking Rhodes. After a few moments, a man pointed a .357 handgun at Rhodes' head and threatened to kill him. As Rhodes turned to walk away, the man fired several (at least three, and possibly four or five) shots at Rhodes, striking him once in the right leg and once in his upper right back. The shot to the back, which caused considerable damage to Rhodes' heart, proved fatal.

Bramlett, a resident of Tulsa who also attended the concert, was arrested and charged with Rhodes' murder. The case proceeded to trial in January 1990. The prosecution had no physical evidence linking Bramlett to the murder. Instead, the prosecution's case rested exclusively on the testimony of seven witnesses who identified Bramlett as the individual who shot and killed Rhodes. Four of these witnesses were friends of Rhodes, none of whom had met or seen Bramlett prior to the shooting. Two of the witnesses (Keith Overstreet and Patrick Ray) were admitted members of the Tulsa Crips gang who had been involved in the physical altercations with Downing and Rhodes

2

immediately preceding Rhodes' murder. The final witness (Richard Hill) was a close friend of Bramlett, who testified he and Bramlett attended the party and that Bramlett shot Rhodes. The defense's case included four witnesses (defendant's sister, one of his brothers, and two of his friends) who testified that Bramlett attended the concert in Oklahoma City and returned home to Tulsa around 3 a.m. the following morning (approximately 75 to 95 minutes prior to the shooting of Rhodes). The defense also presented the testimony of an Oklahoma City detective, who testified that one of the prosecution's identification witnesses had initially identified another individual (a gang member named Michael Marshall, a/k/a/ "Bio") as the shooter. At the conclusion of all the evidence, the jury found Bramlett guilty of first degree murder and recommended a sentence of life without parole. Bramlett was formally sentenced by the trial court on February 5, 1990.

Bramlett filed a direct appeal asserting eleven propositions of error, none of which are at issue in this appeal. The OCCA rejected all of the claims and affirmed Bramlett's conviction and sentence on June 10, 1994. Nearly three years later, on March 3, 1997, Bramlett filed an application for post-conviction relief in state district court asserting seven grounds for relief. The state district court denied relief, as did the OCCA.

Bramlett filed his federal habeas petition on September 29, 1997, asserting the same seven issues raised in his application for post-conviction relief. On November 22, 1999, the magistrate judge recommended that the petition be denied. The district court,

3

after considering Bramlett's objections, adopted the magistrate's recommendation, denied habeas relief, and entered judgment against Bramlett. The district court subsequently granted Bramlett a certificate of appealability (COA) with respect to two issues: (1) whether the prosecution withheld exculpatory evidence in violation of Brady, and (2) whether trial counsel was ineffective for failing to investigate and present exculpatory evidence. Although Bramlett has since requested an expanded COA from this court, that request has been denied.

II.

*Standard of review*

Because Bramlett's federal habeas petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), it is governed by the provisions of the AEDPA. Wallace v. Ward, 191 F.3d 1235, 1240 (10th Cir. 1999) (citing Rogers v. Gibson, 173 F.3d 1278, 1282 n.1 (10th Cir. 1999), cert. denied, 528 U.S. 1120 (2000)), cert. denied, 530 U.S. 1216 (2000). Under the AEDPA, the appropriate standard of review for a particular claim hinges on the treatment of that claim by the state courts. If a claim was not decided on the merits by the state courts (and is not otherwise procedurally barred), we may exercise our independent judgment in deciding the claim. See LaFevers v. Gibson, 182 F.3d 705, 711 (10th Cir. 1999). In doing so, we review the federal district court's conclusions of law de novo and its findings of fact, if any, for clear error. Id. If a claim was adjudicated on its merits by the state courts, the petitioner will

4

be entitled to federal habeas relief only if he can establish that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d)(2). "Thus, we may grant the writ if we find the state court arrived at a conclusion opposite to that reached by the Supreme Court on a question of law; decided the case differently than the Supreme Court has on a set of materially indistinguishable facts; or unreasonably applied the governing legal principle to the facts of the prisoner's case." Van Woudenberg v. Gibson, 211 F.3d 560, 566 (10th Cir. 2000) (citing Williams v. Taylor, 529 U.S. 362, 413 (2000)), cert. denied, 121 S.Ct. 1117 (2001).

*Brady* violation

Bramlett contends he is entitled to federal habeas relief because the prosecution suppressed favorable evidence in violation of the principles announced by the Supreme Court in Brady. Specifically, Bramlett contends the prosecution suppressed evidence that: (1) four witnesses (Keith Overstreet, Patrick Ray, Richard Hill and Darwyn Horey), three of whom testified at trial during the prosecution's case-in-chief, informed police prior to trial that Bramlett was not the shooter, and (2) notwithstanding their pretrial statements, these individuals were coerced by the police and/or prosecution into testifying

5

at trial and identifying Bramlett as the shooter.[1] In support of his claim, Bramlett has presented post-trial affidavits from two of these individuals, and transcripts of post-trial interviews with the other individuals.

Bramlett first raised this issue in his application for post-conviction relief. The OCCA concluded the claim was procedurally barred:

> In his first proposition, Petitioner is apparently attempting to establish, by using recent affidavits of recanting witnesses, that he has just discovered the prosecution failed to disclose exculpatory eyewitness identification and unlawful intimidation of witnesses by police. However, in his own brief, Petitioner acknowledges that his trial counsel was privy to the exculpatory eyewitness identification evidence, and even used it to cross-examine one of the recanting witnesses at trial. Moreover, even if trial counsel was not completely privy to police tactics during the investigation, trial counsel was aware that at least one eye witness had changed his story and that reasons for such change might need to be investigated and determined. Petitioner has not established that this proposition was not adequately addressed, and/or could not have been adequately raised, by both trial counsel and appellate counsel. (Citation omitted.) The proposition may not be the basis of this post-conviction application. 22 O.S. 1991, § 1086.

App. at 99.

We conclude that respondent has failed to adequately preserve the procedural bar issue on appeal. Although respondent briefly mentions the OCCA's procedural bar ruling in his appellate brief, Aplee Br. at 3, he offers no explanation for why we should

---

[1] Bramlett has also submitted affidavits from Troy Driver, III, and Michael Marshall. Neither of these individuals (a) was present at the time of the shooting, (b) testified at trial, or (c) has alleged he was coerced into identifying Bramlett as the shooter. Thus, their affidavits will not be considered in connection with Bramlett's <u>Brady</u> claim.

6

recognize that ruling. Instead, respondent asserts that the claim is "procedurally barred for the reasons stated in the court below." Id. at 4. We conclude this vague assertion is insufficient to preclude consideration of the merits of Bramlett's Brady claim, particularly since the record on appeal does not contain the pleadings respondent filed with the district court. See Walker v. Gibson, 228 F.3d 1217, 1240 (10th Cir. 2000) (refusing to consider conclusory, unsupported and undeveloped arguments), cert. denied, 121 S.Ct. 2560 (2001); see also Hooks v. Ward, 184 F.3d 1206, 1216 (10th Cir. 1999) (noting that procedural default is an affirmative defense that may be waived by the respondent).

Even assuming respondent has adequately preserved the procedural bar issue for purposes of appeal, we conclude we are not bound by the OCCA's ruling. A federal court entertaining a petition for writ of habeas corpus from a state prisoner may not review a claim which the state courts declined to pass upon because of an independent and adequate state procedural ground. See Wainwright v. Sykes, 433 U.S. 72, 86-87 (1977). For a state procedural rule to be "adequate," it must not be applied in "an arbitrary or unprecedented fashion," and it "cannot be 'manifestly unfair' in its treatment of the petitioner's federal constitutional claim." Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001). Here, we are firmly convinced that the OCCA's procedural bar ruling is inadequate because, in determining Bramlett's Brady claim could have been asserted on direct appeal, the OCCA "made a gross factual error which has 'no foundation in the record.'" McBee v. Grant, 763 F.2d 811, 816 n.4 (6th Cir. 1985) (quoting Walker v.

7

Engle, 703 F.2d 959, 967 (6th Cir. 1983)). More specifically, it is beyond dispute that the key evidence which Bramlett now asserts was suppressed by the prosecution was unavailable to Bramlett or his counsel at the time of direct appeal.[2] Thus, "the notions of comity that underlie the Wainwright v. Sykes rule do not require that we defer" to the OCCA's procedural bar ruling in this rare instance. Walker, 703 F.2d at 967. To conclude otherwise would allow the OCCA, by way of a clearly erroneous factual finding, "to insulate [a] federal constitutional question[] from federal review." Id.

We turn to the merits of Bramlett's Brady claim, which we review de novo. In Brady, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The Court has since indicated that the prosecution's duty to disclose favorable evidence "encompasses impeachment evidence as well as exculpatory evidence." Strickler v. Greene, 527 U.S. 263, 280 (1999) (citing United States v. Bagley, 473 U.S. 667, 676 (1985)). In addition, "the rule encompasses evidence known only to police investigators and not to the prosecutor." Id. at 280-81 (internal quotation omitted). To obtain federal habeas relief under Brady, Bramlett must satisfy

---

[2]    This case is distinguishable from Hale v. Gibson, 227 F.3d 1298, 1330 (10th Cir. 2000), cert. denied, 121 S.Ct. 2608 (2001), which held that "Oklahoma's bar on raising claims on post-conviction that could have been raised on direct appeal is an independent and adequate state bar with regard to Brady claims." (Emphasis added.).

three requirements: (1) he must demonstrate that the prosecutor suppressed evidence; (2) he must establish that the suppressed evidence was favorable to him, either because it was exculpatory or impeaching; and (3) he must establish that the suppressed evidence was material. See Gonzales v. McKune, 247 F.3d 1066, 1075 (10th Cir. 2001).

In analyzing Bramlett's claim, we begin by separately analyzing the post-trial statements from each of the four witnesses to determine whether the information contained therein, if true, was suppressed by the prosecution and was favorable to Bramlett. Because, as discussed below, it appears the prosecution suppressed exculpatory or impeaching information from three of these witnesses (assuming their post-trial statements are true), we proceed to address the question of materiality collectively. See Kyles v. Whitley, 514 U.S. 419, 436-37 (1995) (discussing need to determine materiality by considering suppressed items of evidence collectively). Finally, because we conclude the evidence, if true, was material, we explain why a remand is necessary in order to allow the district court to conduct further proceedings, including an evidentiary hearing, on the Brady issue.

*Witness Keith Overstreet*

Keith Overstreet, an admitted member of the Tulsa Crips, testified during the prosecution's case-in-chief that Bramlett was his friend and was responsible for the shooting. Tr. at 535, 537, 548, 555. He further testified that the police never told him

9

Bramlett was the shooter, and that no one "suggested to [him] in any way or told [him] that that is what [he] w[as] supposed to say when [he] came to court." Id. at 539. On cross-examination, Overstreet admitted that, although he was interviewed by police shortly after the murder, he did not actually identify Bramlett as the shooter until a few days prior to trial. Id. at 568. According to Overstreet, he sent a letter to the district attorney identifying Bramlett as the shooter, id. at 570, because "it was a grief that [he] had to get off [his] mind" and "[his] parents told [him] to tell anyway." Id. at 573. Although defense counsel elicited from Overstreet the fact that he was facing serious drug charges in state court, id. at 571, defense counsel did not ask whether Overstreet had entered into any deal with the prosecutor.

Overstreet signed an affidavit in February 1997 stating that Tulsa resident Terrance Charles Malone, nicknamed T.C., was the person who actually shot and killed Rhodes. App. at 234. According to Overstreet, "Clarence Bramlett left before the shooting" and "did not shoot the gun." Id. Overstreet stated that he "told the Detectives and everybody in the beginning that 'T.C.' was the shooter." Id. Overstreet alleged, however, that "[t]he D.A. lady told [him] [his] charge (cocaine) would be dropped if [he] identif[ied] Clarence as the shooter." Id. Overstreet further alleged that the district attorney threatened him with "life without parole" and he agreed to testify because he "didn't want to be charged as an accessory to murder and do life with no chance of parole." Id.

10

The magistrate judge and district court concluded that "Overstreet's recantation [wa]s insufficient to establish a Brady violation." App. at 104. In particular, the magistrate judge noted that "suppression of evidence by the State . . . [wa]s lacking," id. at 102, since Bramlett's trial counsel "had information, at the time of the trial, indicating that at least Keith Overstreet had previously identified T.C. as the shooter in statements made to police." App. at 304. Further, in what appears to be a determination of materiality (but is not labeled as such), the magistrate judge noted "that defense counsel conducted cross-examination with respect to: (1) the fact that Overstreet originally did not identify Petitioner as the shooter; (2) that the name T.C. had come up in discussions with police; and (3) that Overstreet 'changed' his story and ultimately told police that Petitioner was the shooter." Id. at 104.

We conclude the analysis of the magistrate judge and the district court is only partially correct. It is true that defense counsel knew, prior to trial, that Overstreet had initially identified a person named "T.C." as the shooter. Thus, there was obviously no suppression of this information. Defense counsel did not know, however, that Overstreet had informed the police and the prosecution specifically that Bramlett was not the shooter, or that the prosecutor allegedly made a deal with Overstreet in return for his agreement to identify Bramlett as the shooter. In other words, the prosecution, either knowingly or inadvertently, allegedly suppressed two related pieces of information favorable to Bramlett, one of which was exculpatory and the other of which was

11

impeaching.

*Witness Patrick Ray*

Patrick Ray, a member of the Tulsa Crips, testified during the prosecution's case-in-chief that Bramlett shot Rhodes. Tr. at 610-11. During cross-examination, Ray admitted that he did not recognize Bramlett at the preliminary hearing and was unable at that time to identify him as the shooter. Id. at 616. Ray further admitted that he did not know on the evening of the crime that Bramlett was the shooter, and did not tell authorities that Bramlett was the shooter until after Overstreet had done so. Id. at 635. On redirect, Ray testified that during the preliminary hearing he initially identified Bramlett as the shooter, but later changed his story because he felt pressure from members of Bramlett's family who were in attendance at the hearing. Id. at 644, 646.

In an affidavit signed in October 1996, Ray stated that his trial testimony was untrue. According to Ray, he initially pointed the gun at Rhodes and threatened to kill him. App. at 236. Ray stated that Rhodes slapped the gun from his hand and it fell to the ground. Id. According to Ray, Richard Hill retrieved the gun and used it to shoot Rhodes. Id. Ray stated that after the shooting, he, Overstreet, and Darwyn Horey (all Tulsa Crip members) agreed that if they were questioned about the shooting they "would say that [they] had not actually seen the shooting but [they] had heard that the shooter's name was 'T.C.' 'T.C.' [wa]s not the name of an actual person. To [them] the initials

12

'T.C.' meant 'Tulsa Crip.'" Id. According to Ray, he was questioned by a police officer approximately two weeks after the shooting and told the officer he had "heard that the shooter's name was 'T.C.'" Id. Ray stated he was questioned by other officers a few days later, and repeated what he had told the first officer. Id. at 236-37. Ray stated that prior to trial, the prosecutor and two detectives threatened to charge him "as an accessory to murder." Id. at 237. In response, Ray allegedly gave the prosecutor "the name of Clarence Bramlett." Id. Ray stated that his "fear of being charged as an accessory to Derrick Rhodes' murder caused [him] to falsely identify Clarence Bramlett as the shooter." Id.

The magistrate judge concluded that "Ray's affidavit testimony . . . [wa]s insufficient to establish a Brady violation." Id. at 105. More specifically, the magistrate concluded:

> With respect to Ray's statement that he told Tulsa police that he heard T.C. was the shooter, this evidence is not exculpatory. Ray states that T.C. was a fictional person. Thus, the evidence would not help prove that Petitioner did not commit the crime. As to any allegations that Ray told police Petitioner was not the shooter and that Ray was pressured into identifying Petitioner, Ray's affidavit likewise does not support Petitioner's Brady claim. First, Ray states that Richard Hill shot Derrick Rhodes but does not state that he gave this information to the police or prosecution. Consequently, there is no evidence that the prosecution knew of this evidence and/or withheld it from Petitioner. Second, Ray's affidavit states that he gave the prosecution Petitioner's name in response to the Overstreet statement allegedly identifying him as the shooter, not that the prosecution told him he had to identify Petitioner as the shooter.

Id. at 105-06.

13

Notably, Bramlett did not object to the magistrate judge's analysis. Thus, the district court effectively considered Bramlett to have waived any objection. Id. at 160. The same now holds true for purposes of appeal, since it is well established that "[f]ailure of a [party] to object to a magistrate judge's recommendations results in a waiver of appellate review." Fottler v. United States, 73 F.3d 1064, 1065 (10th Cir. 1996).

*Witness Richard Hill*

Richard Hill, originally listed as a defense witness, testified during the prosecution's case-in-chief. Hill, who identified himself as a longtime friend of Bramlett, testified that he and Bramlett left the rap concert and ended up at the street party. Tr. at 739-40, 746-47. Hill further testified that Bramlett was the person who shot Rhodes. Id. at 750. Hill testified that, after the shooting, he and Bramlett drove back to Tulsa. Id. at 751. On cross-examination, Hill admitted that he had talked to defense counsel three times prior to trial, and on each occasion specifically stated that Bramlett was not the shooter. Id. at 753-54. Hill testified that he had lied to defense counsel out of friendship to Bramlett. Id. at 755, 758.

Hill was subsequently interviewed in January 1997 by an investigator working for Bramlett's post-conviction team. During the interview, Hill stated that he was present at the crime scene at the time of the shooting, but did not see Bramlett at all that evening. App. at 247. Hill further stated that he was approached by Oklahoma City detectives in

14

late 1989 and denied knowing anything about the shooting. Id. at 248. He stated he was subsequently interviewed by detectives just prior to trial, and told them that Bramlett was not at the crime scene at the time of the murder. Id. at 252. He also told the detectives that he had not seen who shot Rhodes. Id. Hill stated that "the questions [from the detectives] started getting a little fiercer" and they were "trying to make [him] say that . . . Clarence was there, and that he was the shooter." Id. He further stated that the detectives told him that if he "didn't identify [Bramlett] as being the shooter or whatever that [he] could get some – some time, or something could happen to [him]." Id. at 253. In short, Hill stated he felt coerced into identifying Bramlett as the shooter. Id. He stated he was scared and "didn't want to be the one that ha[d] to maybe go down for this situation or do any kind of time." Id. at 253-54. Hill stated his testimony in court was not truthful. Id. at 255. Consistent with his first statement to police, Hill stated that he did not see Bramlett on the evening of the shooting. Id. at 256.

The magistrate judge concluded that "Hill's recantation . . . fail[ed] to establish that the State suppressed exculpatory evidence." Id. at 107. In support of this conclusion, the magistrate stated: "There is no evidence that Hill ever identified anyone other than Petitioner as having committed the crime," and "defense counsel was clearly aware that Hill had originally refused to identify Petitioner as the person responsible for the shooting" and "elicited these facts from Hill on cross-examination." Id. As for Hill's "allegation of coercion," the magistrate concluded it was "not only extremely conclusory

15

but also clearly refuted by the trial record." Id. In support of this conclusion, the magistrate noted that defense counsel had represented to the trial court that he was present when the police, in particular Oklahoma City Detective Randy Scott, asked to speak with Hill, and that he had informed Hill "'that he had a right to talk with them if he wanted to,'" and "'a right not to talk with them if he didn't want'" to. Id. at 108. Defense counsel further represented to the trial court that Detective Scott "did not use any type of coercion or force or anything improper." Id.

Although Bramlett objected to the magistrate judge's conclusions, the district court accepted them. In addition, the district court noted that defense counsel interviewed Hill within hours after he was interviewed by police detectives, and that it was "simply not believable that if Mr. Hill had been coerced by detectives . . . that Hill would not have told [defense] counsel or that [defense] counsel would not have learned that when he interviewed him." Id. at 161. The district court also concluded that Hill's "recantation [wa]s simply not credible" because it "occurred seven years after trial in an interview by Petitioner's investigator," Hill was a close friend of Bramlett's, Hill "never identified anyone else as the shooter," and Hill testified at trial that he "felt that the truth would be much better than a lie, even though [he] was testifying against [his] friend." Id. at 162.

After examining the record, we reject the conclusions reached by the magistrate judge and district court. The magistrate was incorrect in concluding that the prosecution did not suppress any evidence favorable to Bramlett. According to Hill's January 1997

16

statement, he specifically informed the police in late 1989 that he did not know anything about the shooting, and again told them just prior to trial that Bramlett was not involved in the shooting and in fact was not present at the crime scene at the time of the murder. Obviously, this information is favorable to Bramlett. The magistrate was also incorrect in concluding that Hill's claim of coercion was refuted by defense counsel's statements to the trial court. Although it is true that defense counsel informed the trial court that Detective Scott "did not use any type of coercion or force or anything improper," id. at 108, defense counsel was talking only about the point in time when Detective Scott was trying to persuade Hill to speak with him. It is uncontroverted that defense counsel was not present during the ensuing interview of Hill by Detective Scott and other police. Thus, defense counsel's statements to the trial court do not refute Hill's assertion that the police ultimately coerced him into identifying Bramlett as the shooter. In a similar vein, we reject the district court's inferential finding that, had Hill actually been coerced by the detectives or prosecutor, defense counsel would have uncovered this fact during his subsequent interview with Hill. Not only are we concerned about the limited evidence available to the district court to make this finding, we question whether it is a reasonable inference. We think it just as likely that, had Hill been coerced by detectives or the prosecutor, he would not have willingly provided this information to defense counsel prior to testifying. Finally, although we view post-trial recantations with skepticism, we believe that Hill's credibility is best judged after an evidentiary hearing.

17

*Darwyn Horey (a/k/a "L.A.")*

Darwyn Horey's name was frequently mentioned during the trial (he was the alleged instigator of the initial fight with Alex Downing), but Horey did not testify as a witness. Horey, who is serving time in federal prison in Leavenworth, was interviewed in January 1997 by an investigator working for Bramlett's post-conviction team. Horey stated he initially saw the murder weapon, prior to the trip to Oklahoma City, in the possession of T.C., "a former Crip out of Los Angeles." App. at 264. Horey stated that at the street party, T.C. wrestled with Patrick Ray and Keith Overstreet over the gun, and ultimately gained control of it and used it to shoot Rhodes. Id. at 264, 266. Horey stated he was interviewed by Oklahoma City detectives regarding the murder, and was informed he would be charged with either murder or accessory to murder. Id. at 268. He allegedly told the detectives that T.C. shot Rhodes, but he did not identify T.C. Id. at 269. Horey stated he was shown photos of Bramlett, but did not identify him as T.C. Id. at 270. Horey stated the detectives promised to help him with some drug charges pending in Tulsa if he agreed to identify Bramlett as T.C., and Horey agreed under pressure to do so. Id. at 271-72. According to Horey, the detectives told him he was supposed to testify that he saw Richard Hill and Bramlett arrive at the street party together, that Bramlett was wrestling with Overstreet and Ray for the gun, and that Bramlett ended up with the gun and used it to shoot Rhodes. Id. at 273. Horey stated that when he showed up to testify at Bramlett's trial, Detective Scott had him look in the courtroom, pointed out Bramlett, and

18

told him all he needed to do was identify Bramlett as having the gun.  Id. at 275.

However, the prosecution did not use him as a witness because he allegedly expressed

misgivings about testifying.  Id. at 276.

The magistrate judge briefly mentioned Horey's post-trial statements, but did not

specifically determine whether the prosecution violated Brady by suppressing Horey's

alleged pre-trial statements.  Instead, the magistrate concluded that Horey's post-trial

statements "elicit[ed] more inconsistencies."  Id. at 110.  The district court did not address

Horey's statements at length either, instead characterizing them as containing

"inconsistencies."  Id. at 163.

Assuming Horey's post-trial statements are true, it is apparent he provided

information to the police that was favorable to Bramlett, but that the prosecution did not

forward that information to defense counsel.  As noted, Horey allegedly informed the

police that an individual named T.C. was responsible for shooting Rhodes, and, when

shown a photo of Bramlett, told the police that Bramlett was not T.C. (in other words

saying that Bramlett was not the shooter).  Horey also allegedly reached a tentative

agreement with the police under which he would falsely testify that Bramlett was the

shooter in exchange for the police assisting him with some pending drug charges in Tulsa.

*Materiality*

Because the evidence presented by Bramlett, if true, indicates the prosecution

19

suppressed favorable information supplied by Overstreet, Hill and Horey, the question becomes whether suppression of that information was material.  Materiality is established only "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different,'" and "[a] 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'"  Kyles, 514 U.S. at 433-34 (quoting Bagley, 473 U.S. at 682, 678).  In other words, the question is whether, in the absence of the suppressed information, Bramlett "'received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'"  Strickler, 527 U.S. at 289-90 (quoting Kyles, 514 U.S. at 434).

The magistrate judge and the district court concluded "that even if the recantations and statements submitted by Petitioner were treated as exculpatory or impeaching evidence that was suppressed by the State, 'Petitioner's Brady claim would fail for the lack of resulting prejudice.'"  App. at 163 (quoting magistrate's report and recommendation).  More specifically, the district court stated:

> The Court agrees with Petitioner that he had no duty at trial nor presently to produce evidence showing that someone else shot Derrick Rhodes.  However, all of the inconsistencies in the recanted testimony of Overstreet, Ray and Hill and the affidavits of Horey, Driver and Marshall identified by the Magistrate Judge as well as consideration of their relationship to the Defendant, their incentive or motive to fabricate, including self-interest, the credibility that an individual who had barely turned 12 when the crime occurred, who states was not present at the scene of the crime and did not even know about the shooting, killed Derrick Rhodes, together with the fact that four other witnesses who observed the

20

shooting at a range from 6 to 20 feet and who had no apparent motive or reason to fabricate or to inculpate the Petitioner all positively identified Petitioner as the person who shot Derrick Rhodes at trial, lead the Court to conclude that there is no reasonable probability that the result of trial would have been different or that jurors would have found a reasonable doubt, had the allegedly suppressed evidence been presented at trial. It is true, as Petitioner points out, that the non-recanting eyewitnesses who identified Petitioner at trial as the shooter were complete strangers to him and that those witnesses' descriptions of what Petitioner was wearing varied somewhat and several said he was wearing either a dark blue or black shirt, they weren't sure. However, strangers lack an incentive or motive to lie. Several of these witnesses identified Petitioner at the preliminary hearing as well as at trial. All were in close proximity to the shooter at the time of the shooting. The witnesses to a shooting at approximately at 4:30 in the morning were not sure, either as a result of darkness or lack of memory, as to exactly what the shooter was wearing does little to detract from the positive identification of Petitioner as the person who fired the shots. Regarding Petitioner's alibi defense, it is clear that the jurors did not believe that defense – that the jurors did not find Petitioner's alibi witnesses credible. Undoubtedly had the allegedly suppressed evidence and/or the recanted testimony been presented instead of the testimony of Hill, Overstreet and Ray, jurors would have found their testimony equally incredible because of the inconsistencies therein and the likely motive or incentive for those individuals to lie.

App. at 163-65.

In our view, the issue of materiality is much closer than suggested by the district court. Ignoring for a moment the testimony of the three witnesses (Overstreet, Ray and Hill) who have now recanted their trial testimony, it is undisputed that the prosecution presented four other witnesses (Broderick Cofer, William Boyd, Tonja Lee, and Rhonda Graham), all of whom were friends of the victim and strangers to Bramlett, and all of whom identified Bramlett as the shooter. As pointed out by Bramlett, there were certain weaknesses in the testimony of each of these witnesses. For example, the four gave

21

differing descriptions of the clothing worn by the shooter (one of the witnesses said the shooter was wearing dark colored clothes; two said the shooter was wearing white shorts; the fourth could not remember whether the shooter was wearing shorts or pants). Three of the witnesses (Boyd, Lee and Graham) testified they were standing sideways from the shooter; two (Boyd and Graham) admitted they saw only the side of the shooter's face. Two witnesses (Cofer and Boyd) admitted they were drinking alcohol prior to the shooting. One witness (Boyd) admitted that, during a pretrial interview with police, he was shown a photographic line-up and tentatively identified Michael Marshall (a Tulsa Crip member and friend of Overstreet, Ray and Horey) as the shooter. Finally, all of these witnesses essentially agreed that the shooting occurred during a chaotic fight situation that took place in a poorly lit area in the middle of the night.

Undoubtedly, the testimony of these four prosecution witnesses was bolstered by the testimony of Overstreet and Hill. Overstreet testified he was a resident of Tulsa and a friend of Bramlett. Overstreet admitted to being a member of the Tulsa Crips and, although he testified that Bramlett was not a member, stated that Bramlett associated with Crip members and was involved with Crip members in the physical altercations that preceded the shooting. Hill's testimony was perhaps the most damaging to Bramlett. At the time of trial, Hill was working for the Tulsa County Sheriff's Department and was

studying to be an undersheriff. He testified that he was a close friend of Bramlett,[3] and had driven with him from the concert to the street party. Hill further testified that Bramlett was the shooter, and that he (Hill) had lied to defense counsel about Bramlett's involvement "out of friendship" to Bramlett. Tr. at 758.

Because the prosecution's case was entirely dependent on eyewitness identification testimony, the credibility of its witnesses was crucial. Assuming the evidence now presented by Bramlett is true, the prosecution would have undoubtedly bolstered the credibility of its witnesses, and in turn substantially strengthened its case, by suppressing that evidence. Had defense counsel, and in turn the jury, been aware of the exculpatory evidence, it seems doubtful they would have credited Overstreet's and Hill's identification of Bramlett as the shooter. Further, had defense counsel been aware of Horey's pretrial interactions with the police, he could have presented Horey as a defense witness, and could have arguably reinforced the notion that the police and/or prosecution engaged in coercive tactics with potential witnesses. That would have left the prosecution with only four eyewitnesses, all strangers to Bramlett, and all with various weaknesses in their testimony. Though it is a close issue, we are ultimately persuaded that the evidence now pointed to by Bramlett, assuming it is true, "'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the

_____

[3]    During closing arguments, the prosecutor characterized Hill as Bramlett's "best friend." Tr. at 888.

23

verdict.'" Strickler, 527 U.S. at 290 (quoting Kyles, 514 U.S. at 435).

Although we conclude the district court erred in dismissing Bramlett's Brady claim, it is apparent that our conclusions regarding the claim are tentative in that they hinge on the assumption that the post-trial affidavits and statements presented by Bramlett are true. To resolve the Brady issue, we must remand the case to the district court with directions to conduct an evidentiary hearing.[4] This will afford the district court the opportunity to hear directly from Overstreet, Hill and Horey, as well as possibly from defense counsel, the prosecutor, and any relevant police witnesses. The district court then will be in a position to determine whether the post-trial statements from Overstreet, Hill and Horey are credible. If they are not credible, Bramlett's Brady claim will obviously fail. If, however, the post-trial statements are deemed to be credible, the district court will need to revisit the Brady materiality issue and determine whether Bramlett is entitled to federal habeas relief.

*Ineffective assistance of counsel*

In a separate issue, Bramlett contends his trial counsel was ineffective for failing to investigate and present exculpatory evidence that the individual identified by

---

[4]     The AEDPA, in particular 28 U.S.C. § 2254(e)(2), does not preclude Bramlett from receiving an evidentiary hearing because he "diligently sought to develop the factual basis underlying his [Brady claim], but a state court has prevented him from doing so." Miller v. Champion, 161 F.3d 1249, 1253 (10th Cir. 1998).

24

Overstreet as "T.C." was in fact Tulsa resident and Crips member Terrance Charles Malone. Bramlett contends that the presentation of evidence regarding T.C.'s identity would have undermined the testimony of Overstreet and Ray (both of whom were admitted Crip members) and would have bolstered the conclusion that Rhodes was shot by a member of the Crips.

Bramlett first raised this issue in his application for post-conviction relief. The OCCA concluded the issue was procedurally barred due to Bramlett's failure to assert it on direct appeal. App. at 131. The district court refused to recognize the OCCA's procedural bar ruling, however, because the issue required "a review of facts outside the [trial] record." Id. at 133 (citing English v. Cody, 146 F.3d 1257 (10th Cir. 1998)). On the merits, the district court concluded that Bramlett's counsel was not ineffective because the evidence now presented by Bramlett regarding T.C. was "insufficient to undermine confidence in the jury's verdict." App. at 133.

Bramlett's claim is governed by the familiar two-part test announced in Strickland v. Washington, 466 U.S. 668, 687 (1984). Under that test, Bramlett must demonstrate that (1) defense counsel's performance was constitutionally deficient (i.e., it fell below an objective standard of reasonableness), and (2) there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different. Id. at 688.

Even assuming, arguendo, that Bramlett can satisfy the first prong of Strickland,

25

we conclude he cannot satisfy the second prong.[5] Although several of the witnesses in this case have identified an individual named "T.C." as the shooter, only one (Overstreet) has stated that T.C. was actually Terrance Charles Malone.[6] Further, the evidence contained in the record that describes Malone strongly suggests he was not the shooter. App. at 307. In a February 1997 interview conducted by a member of Bramlett's post-conviction team, Malone stated he was a lifelong Tulsa resident who, in 1989, was a member of the Tulsa Crips. Id. at 308. Malone further stated that he knew Overstreet, Ray, Horey, and several other members of the Crips who were involved in the physical altercation that preceded the shooting of Rhodes. Id. at 309. Malone admitted he was commonly known as "T.C." Id. at 310. However, Malone stated that he was age eleven at the time of the shooting, id. at 311, and denied driving from Tulsa to Oklahoma City to attend the rap concert. Id. at 309. We agree with the district court that Bramlett is not entitled to habeas relief on his ineffective assistance of counsel claim.

---

[5] The district court seemingly concluded that the Brady and Strickland claims were two sides of the same coin, and that the prejudice analysis in each was substantially similar, if not identical. We disagree. As outlined above, the Brady claim concerns evidence that could have exculpated Bramlett as the shooter and discredited several of the prosecution's eyewitnesses. In contrast, the Strickland claim narrowly focuses on trial counsel's failure to investigate evidence that may have placed responsibility for the crime on another individual.

[6] Horey stated that T.C. was an individual from Los Angeles. Overstreet did not identify T.C. Ray stated that T.C. was not a real person.

# III.

We AFFIRM the judgment of the district court on Bramlett's ineffective assistance of counsel claim. We REVERSE the judgment of the district court and REMAND with directions to the district court to conduct an evidentiary hearing, and such other proceedings as may be necessary, on Bramlett's claim under Brady.

Entered for the Court

Mary Beck Briscoe
Circuit Judge